IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KEVIN W. MOORE                                                        PLAINTIFF

      V.               Civil No. 2:22-cv-02049-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                       DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

      Plaintiff, Kevin W. Moore, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.      Procedural Background

      Plaintiff filed his application for DIB on May 16, 2019, alleging disability since May 10, 2019, due to lumbar degenerative disk disease ("DDD"); lumbar radiculopathy; facet syndrome of the lumbar; cervical radiculopathy; cervical myofascial strain; myofascial muscle pain; postherpetic neuralgia ("PHN") to the head, a complication of shingles; facet hypertrophy of the lower region; and the residuals of an old scaphoid fracture. (ECF No. 13, pp. 19, 67-68, 79, 150-158, 184, 201-202, 227-228). An administrative hearing was held via telephonic means on September 28, 2020. (*Id*. at 36-65). Plaintiff was present and represented by counsel.

      Born in August 1976, Plaintiff was 42 years old on his alleged onset date ("AOD") and possessed a high school education. (ECF No. 13, pp. 28, 150). In the 15 years prior to his AOD,

he had past relevant work ("PRW") experience as a machine operator II, quality control inspector, machine packager, and quality control technician. (*Id*. at 28, 185, 196-200, 222-226).

On December 22, 2020, the Administrative Law Judge ("ALJ"), Hon. Elisabeth McGee, identified Plaintiff's lumbar facet hypertrophy, PHN, depression, anxiety, and idiopathic neuropathy as severe impairments. (ECF No. 13, p. 19). She then concluded he did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.). Despite his impairments, the ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, with no exposure to dust, fumes, or other pulmonary irritants. (*Id*. at 21). Further, she concluded he could only perform simple, routine, and repetitive tasks involving few variables, little judgment, and superficial social interaction, and requiring simple, direct, and concrete supervision. With the assistance of a vocational expert ("VE"), the ALJ ultimately decided Plaintiff could still perform work as a tube clerk, address clerk, and document preparer. (*Id*. at 29).

The Appeals Council denied Plaintiff's request for review on January 24, 2022. (ECF No. 13, pp. 6-10). Plaintiff subsequently filed this action on March 28, 2022. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 16, 17), and the matter is ready for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154

(2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. § 404.1520(a)(4).  If the final stage of the

analysis is reached, the fact finder then considers the Plaintiff's age, education, and work experience in the light of his RFC.  20 C.F.R. § 404.1520(a)(4)(v).

### III.    Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; (3) whether the ALJ properly assessed his subjective complaints; and (4), whether the ALJ's RFC determination is consistent with the medical evidence of record.  For the reasons discussed below, we find substantial evidence to support the ALJ's decision.

### A.    Record Development

Initially, Plaintiff contends that the ALJ breached her duty to develop the record regarding the restrictions imposed by Plaintiff's agoraphobia, which he insists differs from those of generalized anxiety disorder.  While it is true that the ALJ owes a duty to develop the record fully and fairly to ensure her decision is an informed decision based on sufficient facts, she is not required to function as the claimant's substitute counsel.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  Her duty is merely to develop a reasonably complete record.  *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).  Moreover, the ALJ is only required to recontact a treating or consulting physician when a critical issue is undeveloped, and to order medical examinations and tests when the medical evidence presented to her is insufficient to determine whether the claimant is disabled.  *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).  There is, however, no requirement that the ALJ's decision be supported by a specific medical opinion.  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

The record presently before this Court documents a history of treatment for a variety of physical and mental impairments, including depression and anxiety. In 2015, a pain specialist, Dr. Danny Silver at Meridian Medical, diagnosed the Plaintiff with adjustment disorder and anxiety. (ECF No. 13, pp. 598-601). Primary care physician, Dr. Lance Barton, prescribed Depakote in January 2019, for a diagnosis of major depressive disorder. (*Id*. at 610-611, 688-690). Plaintiff indicated that his symptoms were both stable and relieved with medication. And, in May 2019, Dr. Barton documented a normal depression screen. (*Id*. at 623-627, 701-705).

On June 11, 2019, a depression screening administered by internal medicine specialist, Dr. Chris Hardin, documented moderate depression. (ECF No. 13, pp. 841-848). However, an examination noted the Plaintiff to be alert, calm, relaxed, cooperative, and in no acute distress with good judgement, insight, and eye contact. (*Id*. at 838-840).

The following month, Dr. Silver documented a normal mental and emotional status. The Plaintiff was alert, fully oriented, and in no acute distress. (ECF No. 13, pp. 756-761, 993-998, 1043). His diagnosis of adjustment disorder with anxiety remained unchanged. Similar findings were noted during follow-up exams with Dr. Hardin; with Dr. Silver and his treatment team at Meridian Medical; and with neurologist, Dr. Roger Horan, between July and September 2019. (*Id*. at 831-837, 922-926, 989-992, 1037).

On October 2, 2019, Dr. Teresa Kramer reviewed the record and concluded that the Plaintiff's mental impairments were not severe. (ECF No. 13, pp. 71-72).

Plaintiff returned to Dr. Barton on October 29, 2019, at which time he prescribed Zoloft and provided Plaintiff with a counseling referral. (ECF No. 13, pp. 875-879). Although Plaintiff was diagnosed with moderate depression, Dr. Barton indicated that Plaintiff's mental status exam was at "baseline" with a normal mood, affect, judgment, and behavior.

Two days later, Plaintiff underwent an intake assessment with licensed professional counselor ("LPC") Jason Hays at Stonehaven Behavioral Health and Wellness ("SBHW").  (ECF No. 13, pp. 885-889).  Plaintiff indicated he had been off work for the past few months, and he was isolating himself at home as his girlfriend of nine years had also recently left him.  He denied a history of formal mental health treatment, both inpatient and outpatient.   And, although he did participate in some select family events, he preferred to stay home.  Documenting a dysphoric mood, appropriate affect, good insight and judgment, intact memory, good attention/concentration, appropriate thought content, appropriate interview behavior, and normal speech, LPC Hays diagnosed depressive disorder, anxious distress, and agoraphobia.  This would be one of only two diagnoses of agoraphobia.

Records dated between November 2019 and January 2020 from Meridian Medical and a neurologist, Dr. Steve-Felix Belinga, indicate that the Plaintiff was alert and fully oriented.  (ECF No. 13, pp. 888, 902-903, 912-916, 979-983, 1031).

On January 17, 2020, Dr. Rachel Morrisey conducted an independent review of the record.  (ECF No. 13, pp. 85-86, 89-91).  She concluded that the Plaintiff's mental impairments, namely anxiety and depression, resulted in moderate limitations in the following areas of functioning: carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and interacting appropriately with the general public.

Follow-up exams with Dr. Belinga and Meridian Medical between February and July 2020 continued to document unremarkable mental status exams.  (ECF No. 13, pp. 951-953, 968-978).

Plaintiff returned for professional mental health treatment in August 2020.  On August 11, 2020, he reestablished at SBHW with LPC Shelby Knapple, at which time he reported absentmindedness secondary to the medications prescribed, anxiety around others, excessive worry, and overthinking.  (ECF No. 13, p. 933-935).  Plaintiff also indicated that he was not very social, as he preferred to stay home.  LPC Knapple noted a depressed mood, blunted affect, and distractible attention/concentration with appropriate thought content and behavior and good insight and judgment.  She diagnosed moderate major depressive disorder with anxious distress and agoraphobia.

During a follow-up exam with Dr. Silver in September 2020, Plaintiff reported irritability, mood changes, and anxiety secondary to his pain.  (ECF No. 13, pp. 956-967).  He denied experiencing depression and suicidal ideations.  Dr. Silver again noted that his mental and emotional status appeared to be within normal limits, as he was alert, fully oriented, calm, and cooperative.

LPC Knapple completed a mental RFC assessment on December 4, 2020, opining that the Plaintiff had no useful abilities in the following areas: understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; functioning independently; relating predictably in social situations; demonstrating reliability; and working without deterioration or decompensation causing the individual to withdraw from the situation or

to experience exacerbation of symptoms or adaptive behaviors.   (*Id*. at 1059-1060).   This assessment, however, finds no support in the overall record.

Except for some situational mood and affect abnormalities, treatment notes from LPC Hays and LPC Knapple were unremarkable.   These findings are echoed by Dr. Silver and his team at Meridian Medical, Dr. Hardin, Dr. Barton and Dr. Horan.   These records consistently documented a normal mood and affect with good eye contact, insight, and judgment.   Plaintiff was calm, relaxed, cooperative, and in no acute distress.

Although the Plaintiff contends that his diagnosis of agoraphobia necessitated a consultative mental evaluation, he has provided no evidence to indicate how such an exam would have changed the ALJ's decision.   As documented above, Plaintiff was diagnosed with agoraphobia on only two occasions.   Despite multiple appointments with other physicians and medical providers, none of them diagnosed or noted significant issues related to agoraphobia. Therefore, given the conservative nature of the treatment provided, minimal professional mental health treatment received, absence of objective evidence to demonstrate that his alleged agoraphobia was severe, and benign nature of the Plaintiff's symptoms, this Court finds that the ALJ did not breach his duty to develop the record.   The record contains ample evidence upon which she could conclude that the Plaintiff was not disabled.

### B.   Step Two Analysis

Next, Plaintiff asserts that the ALJ's failure to include his agoraphobia, postherpetic neuralgia ("PHN"), cervical radiculopathy, neuropathy, and manipulative impairments as severe impairments merits reversal.   At Step Two, a claimant has the burden of providing evidence of functional limitations in support of his contention of disability.   *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   "An impairment is not severe if it amounts only to a slight abnormality that would

not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id.*  (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

### 1.  Agoraphobia

In her decision, the ALJ explained that she found the Plaintiff's anxiety and depression to be severe impairments, but concluded his agoraphobia was not severe as it did not have more than a *de minimis* effect on the Plaintiff's ability to perform basic work activities.  For the same reasons outlined in the previous section, we find that the evidence of record provides substantial support for the ALJ's conclusion that the Plaintiff's agoraphobia was not severe.

To the extent that the Plaintiff questions whether the non-examining physicians considered his agoraphobia, Dr. Morrisey noted Plaintiff's diagnosis of agoraphobia on the October 2019 intake assessment with LPC Hays.  Plaintiff did not, however, seek out further treatment for his mental impairments until August 2020, after Dr. Morrisey rendered her opinion.  (ECF No. 13, p. 86).  *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments).

The ALJ discussed all the medical evidence, including the intake assessments from LPC Hays and LPC Knapple, noting the voluminous records documenting a normal mood and affect with normal behavior, judgment, and insight, and the fact that the Plaintiff had been diagnosed with agoraphobia on only two occasions.  She also noted the conservative nature of the Plaintiff's treatment, consisting of medication only.  Accordingly, we find that the record provides substantial support for the ALJ's determination that the Plaintiff's agoraphobia was not severe.

### 2. PHN/Shingles

As for his PHN, we note that the Plaintiff's diagnosis occurred in May 2018, approximately ten months prior to his alleged onset date.  On May 8, 2018, Dr. Barton diagnosed Plaintiff with shingles without complication.  (ECF No. 13, pp. 603-605, 678-680).  On exam, he noted a hypersensitive and painful cluster of blisters on the left side of the scalp and neck.  Dr. Barton prescribed Valtrex and Tramadol.

At a follow-up appointment in June with Dr. Deborah Hays, the Plaintiff reported persistent symptoms.  (*Id.* at 681-683).  Dr. Hays diagnosed PHN and prescribed Lyrica.  On June 7 and June 14, 2018, he was evaluated by two dermatologists for an ongoing rash and worsening pain.  (*Id.* at 350-354).  They prescribed Valtrex and advised him to consider acupuncture or nerve blocks.

In October 2019, Plaintiff advised LPC Hays that his shingles had resolved after 17 weeks with the assistance of acupuncture.  (ECF No. 13, p. 887).  *See* 20 C.F.R. § 404.1509 (impairment must last or be expected to last for a continuous period of at least 12 months).  Although Dr. Silver's records continued to include PHN as a diagnosis throughout the relevant period, the record contains no evidence to indicate that any residual impairment, as the Plaintiff reported only occasional left side scalp pain.  (*Id.* at 442-459, 460-465, 472-477, 484-489, 496-501, 756-779, 780-785, 792-797, 804-809, 816-821, 912-916, 922-926, 956-983, 989-998, 1037, 1043).  *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis).  The record shows that his chronic pain was related to chronic myofascial strain, lumbar DDD, lumbar radiculopathy, lumbar facet syndrome, idiopathic neuropathy in the lower extremities, and cervical radiculopathy.  (*Id.* at 442-447, 460-465, 619-627, 697-700, 756-767, 749-750, 780-785, 831-848, 866, 856-858, 875-879, 893-895, 902-903, 912-926, 951-998, 1043).

Further, despite his diagnosis, the Plaintiff continued to work full-time until February 2019. (ECF No. 13, p. 780). *See Orrick v. Sullivan,* 966 F.2d 368, 370 (8th Cir. 1992) (working with impairments weighs against finding that impairment is disabling). This suggests that any residual impairment was not severe.

### 3.  Cervical Radiculopathy

Plaintiff also contends the ALJ erred in failing to include his cervical radiculopathy as a severe impairment. The record does reveal a history of a motor vehicle accident in December 2015, resulting in diagnoses of cervical myofascial strain, cervical radiculopathy, and acute post-traumatic headache. (ECF No. 13, pp. 424-426, 442-474, 484-512, 522-573, 586-605, 613-622, 678-680, 697-700, 762-791, 798-827, 875-879, 893-895, 902-903, 912-926, 956-992). Initially, he sought out only chiropractic care, for a grade 1 retrolisthesis at the C4-5 level with mildly decreased disk space but no fracture or dislocation. (*Id*. at 285, 287-348). Throughout the relevant period, the Plaintiff received pain management services from Dr. Silver and his associates at Meridian Medical. Dr. Silver prescribed Hydrocodone to be taken four times per day.

On May 13, 2019, Plaintiff advised advanced registered nurse practitioner ("ARNP") Patricia Rich that his symptoms were managed to a functional level with the Hydrocodone. (ECF No. 13, pp. 442-447, 762-767). In June, Dr. Hardin noted a full range of motion in his neck with no abnormal findings. (*Id*. at 841-848). And, on July 15, 2019, the Plaintiff advised Dr. Silver that therapy and injections provided functional improvement. (*Id*. at 756-761, 993-998). At that time, an exam revealed tenderness to palpation of the bilateral facets, posterior paraspinals, and midline areas of the cervical spine with restricted mobility. Both flexion and extension produced pain. Later that month, Plaintiff was examined by Drs. Hardin and Horan for complaints of chronic

obstructive pulmonary disease ("COPD") and hypertension.  (ECF No. 13, pp. 833-837).  No cervical abnormalities were noted.

Monthly follow-up appointments with Dr. Silver and his associates between September and December 2019 indicate that his physical exam remained unchanged.  (ECF No. 13, pp. 917-926, 984-992).  Moreover, his complaints centered around the neuropathy in his feet.

On October 29, 2019, Dr. Barton noted a normal range of motion in Plaintiff's neck without rigidity and referred him to neurologist, Dr. Steve-Felix Belinga, for further evaluation of his lower extremity neuropathy.  (ECF No. 13, pp. 875-879).  Dr. Belinga ultimately diagnosed idiopathic peripheral neuropathy and prescribed Gabapentin.  (*Id*. at 893-895, 902-903).  Plaintiff denied neck pain, and there are no exam findings that document neck abnormalities.  (*Id*. at 902).

Between January and September 2020, Plaintiff returned for bimonthly pain management on approximately four occasions.  (ECF No. 13, pp. 912-916, 956-957, 968-983).  Each time, he complained of neck, back, and wrist pain, and his physical exam demonstrated tenderness to palpation of the bilateral facets, posterior paraspinals, and midline areas of the cervical spine with restricted mobility.  Dr. Silver and his associates prescribed a consistent dosage of Hydrocodone and Tizanidine (a muscle relaxer).  They also noted that the Plaintiff's symptoms were managed to a functional level with his current treatment regimen.

Plaintiff followed-up with Dr. Belinga in April 2020 for ongoing complaints of lower extremity neuropathy.  (ECF No. 13, pp. 951-953).  He indicated that taking the Gabapentin at night helped alleviate the daytime somnolence it caused, but he voiced no complaints regarding his neck.  *See Despain v. Berryhill*, 926 F.3d 1024, 1028-29 (8th Cir. 2019).

In addition to these treatment notes, the record also contains RFC assessments from two agency physicians.  On October 2, 2019, Dr. Elizabeth Berry reviewed the record and concluded

that Plaintiff could perform a full range of light work.  (ECF No. 13, pp. 73-75).  In January 2020, Dr. Rosey Seguin-Calderon completed an independent review of the record and affirmed Dr. Berry's assessment.  (*Id*. at 87-89).

The record demonstrates that the treatment provided for Plaintiff's pain, including his cervical radiculopathy, was effective.  *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  Further, we can find no indication in the record that the Plaintiff's treating physicians ever imposed any work-related restrictions related to his cervical radiculopathy.  *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (doctor imposed no functional restrictions based on diagnoses).  To the contrary, Dr. Silver consistently noted that his medication regimen managed his symptoms to a functional level.  Therefore, we find substantial evidence to support the ALJ's findings.

### 4.  Neuropathy

Plaintiff also insists that the ALJ's decision is further flawed by her finding that his idiopathic neuropathy was severe, but his peripheral neuropathy was not.   After reviewing the evidence, we agree with the ALJ's finding that Plaintiff's idiopathic neuropathy was severe, as idiopathic neuropathy was ultimately the diagnosis given by Plaintiff's treating neurologist, Dr. Steve-Felix Belinga.  We also note that idiopathic neuropathy is a form of peripheral neuropathy (damage to the peripheral nerves) for which the cause is unknown.

In early 2019, Dr. Silver diagnosed the Plaintiff with polyneuropathy.  (ECF No. 13, pp. 519-521).  On July 19, Plaintiff reported bilateral foot pain, prompting Dr. Hardin to refer him to a neurologist and increase his Cymbalta dosage.  (*Id*. at 835-837).  He also opined that the opioids

prescribed by pain management to treat Plaintiff's chronic pain contributed to his overall symptomology.

Six days later, Dr. Horan evaluated Plaintiff for complaints of burning/aching in his feet and calves and painful ambulation.  (ECF No. 13, pp. 856-858).  He could walk on his heels and toes, although he did have a limp.  An exam revealed absent pinprick sensation in the toes, while nerve conduction studies were normal.  (*Id*. at 856-858).  It was noted, however, that small fiber neuropathy could not be ruled out.  Dr. Horan ordered a skin biopsy, the results of which are not contained in the record.  On October 29, 2019, Dr. Barton referred Plaintiff to a local neurologist, at the Plaintiff's request, as he no longer wished to drive to Northwest Arkansas.  (*Id*. at 875-879).

Neurologist, Dr. Steve-Felix Belinga examined the Plaintiff on November 11, 2019, noting painful paresthesias from the feet up to ankles.  (ECF No. 13, pp. 893-895).  Noting that the Plaintiff had undergone nerve conduction studies he had not yet been able to review, Dr. Belinga diagnosed hereditary and idiopathic neuropathy.  He prescribed Gabapentin.  When the Plaintiff returned in December, Dr. Belinga again opined that he seemed to be suffering from an idiopathic form of peripheral neuropathy.  (*Id*. at 902-90).  Because the Plaintiff had indicated that the Gabapentin was helpful, Dr. Belinga increased his dosage.

On January 2, 2020, ARNP Rich at Meridian Medical documented numbness in the bilateral dorsal and plantar aspects of his feet.  (ECF No. 13, pp. 912-916).  And three weeks later, Dr. Seguin-Calderon considered Plaintiff's diagnosis of idiopathic polyneuropathy when rendering her assessment that he could perform a full range of light work.  (ECF No. 13, pp. 87-89).

On April 8, 2020, Dr. Belinga noted no new symptoms and a normal exam.  (ECF No. 13, pp. 951-953).  He advised the Plaintiff to continue the Gabapentin and diagnosed hereditary and idiopathic neuropathy.

14

Plaintiff had pain management appointments in May, July, and September 2020.  (ECF No. 13, pp. 956-957, 968-978).   Dr. Silver and associates merely refilled his Tizanidine and Hydrocodone prescriptions.  No changes were made to the medications or dosages prescribed.

Accordingly, it is the opinion of the undersigned that the ALJ did not error in finding Plaintiff's peripheral neuropathy to be non-severe when she found Plaintiff's idiopathic neuropathy to be severe.  The terms essentially describe the same symptoms and exam findings.

### 5.  Manipulative Impairments

Plaintiff further insists that his manipulative impairments were severe.  Records do indicate that he sustained a left scaphoid fracture in 2009 that required surgical correction.  (ECF No. 13, pp. 287-291, 566-569).  In 2015, Plaintiff's chiropractor, Dr. Jim Schilling, noted DeQuervain's tenosynovitis, or swelling of the tendons along the thumb side of the wrist.  Later that year, Dr. Silver assessed him with carpal tunnel syndrome ("CTS").  This diagnosis continued through September 2020, despite Plaintiff's denial of pain in his upper extremities and Dr. Silver's notations that his hands and wrists were "normal in appearance and mobility and were nontender." (*Id*. at 442-477, 502-512, 522-557, 756-797, 822-827, 912-926, 956-983, 989-998).  *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (a mere diagnosis is not sufficient to demonstrate the existence of severe impairments).  Similarly, Dr. Belinga's exams in November 2019, December 2019, and April 2020, documented full strength in all extremities with no abnormalities in the wrists.  (*Id*. at 893-895, 902-903, 951-953).  There are simply no records to support Plaintiff's contention that he had manipulative limitations.

We also note that the Plaintiff continued to work as a machine operator at a box factory until 2019, about three years after he was diagnosed with CTS.  (ECF No. 13, pp. 454-459, 774-779, 804-809, 822-827).  *See Orrick*, 966 F.2d at 370 (working with impairments weighs against

finding that impairment is disabling).  Thus, given Plaintiff's failure to seek out treatment for his alleged CTS during the relevant period and the absence of objective evidence to demonstrate any manipulative limitations, we find no error in the ALJ's determination that this impairment was not severe.

### C.    Subjective Complaints

Plaintiff also argues that the ALJ discounted his subjective complaints, based on the absence of objective medical support, without performing a proper *Polaski* analysis.   In determining a claimant's RFC, the ALJ is required to consider all the evidence relating to his subjective complaints, including: (1) his daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians.  *Polaski*, 739 F.2d at 1322.  The ALJ is not, however, required to discuss every factor when assessing a claimant's subjective complaints.  *Swink v. Saul*, 931 F.3d 765, 770-71 (8th Cir. 2019).  She need only provide sufficient reasons for the weight given to the Plaintiff's complaints.

And, while an ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them, the objective record can provide support for her decision.  *Id*.  An ALJ "may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted).

Contrary to Plaintiff's argument, the ALJ discussed Plaintiff's statements, activities, medical records, function reports, good response to conservative treatment, ability to work with

his impairments, and the opinion evidence of record.  (ECF No. 13, pp. 20-28).  Plaintiff reported the ability to go outside daily; go out alone; spend time with family daily; and regularly attend medical appointments.  (*Id*. at 203-210).  Although the Plaintiff described some difficulty getting along with others secondary to his depression, he remained able to get along with authority figures and said he had never been fired or laid off due to problems getting along with others.  (*Id*.).

The ALJ also properly considered the objective medical evidence, the symptoms Plaintiff both reported and denied to his treating physicians, the conservative nature of the treatment he received, the efficacy of said treatment, the inconsistency of his mental health treatment, and the opinions of four agency physicians.  As previously indicated, he initially received chiropractic treatment for his back and neck pain.  After beginning pain management with Dr. Silver in 2016, Dr. Silver and his associates consistently noted that Plaintiffs pain was managed to a functional level.  Throughout the relevant period, Plaintiff was maintained on oral pain medications, NSAIDs, and muscle relaxers, as well as advised to exercise a minimum of three times a week.  *See Moore v. Astrue*, 572, F.3d 520, 522, 524 (8th Cir. 2009).  He also reported that the Gabapentin was at least somewhat effective in treating his neuropathy.  *See Milam v. Colvin*, 794 F.3d 978, 984 (8th Cir. 2015) (ALJs may consider conservative treatment as detracting from claims of disability).

Plaintiff contends that his failure to obtain consistent treatment was justified by his financial status.  He has, however, provided no evidence to show that he applied for and/or was denied financial assistance to cover his treatment costs.  *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (holding that when there is no evidence that the claimant was ever denied treatment for financial reasons, failure to take medication is relevant to the claimant's credibility); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a claimant's argument that he was unable to afford prescription pain medication, there was no evidence that the claimant sought

treatment available to indigents).  To the contrary, Plaintiff reported smoking and continuing to do so despite encouragement by his physicians to stop.  *See Riggins*, 177 F.3d at 693.  His ability to purchase cigarettes undermines his argument that he was unable to pay for medical treatment.

Plaintiff also seeks to excuse his lack of treatment by arguing that Medicaid made it difficult for him to obtain treatment.  He alleges that there was only one Medicaid approved neurologist in his area and he/she had a substantial wait list.  Further, the Plaintiff claims that Dr. Silver did not typically accept Medicaid, although he did accept Ambetter and BCBS Silver. Unfortunately, the Plaintiff has provided no evidence to indicate that he was ever refused treatment by a neurologist or any other physician.  As for the alleged waiting period to see a physician, the record indicates that he waited only 16 days for an appointment with Dr. Horan and 13 days for Dr. Belinga.  Given that the average wait time for a new patient to see a specialist, even for those with private insurance, is approximately three months, we do not find this argument to be particularly compelling.  Therefore, we find no error in the ALJ's consideration of the Plaintiff's subjective complaints.

### D.      RFC Determination

Lastly, Plaintiff posits that the ALJ's RFC determination failed to account for his combination of impairments, more specifically his anxiety, agoraphobia, and manipulative limitations.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545.  A disability claimant has the burden of establishing his or her RFC.  *Vossen*, 612 F. 3d at 1016.  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such

as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Contrary to Plaintiff's argument, the ALJ did consider all his impairments in combination prior to rendering a decision.  In so doing, she concluded that the Plaintiff had moderate limitations in his ability to concentrate, persist, or maintain pace and adapt or manage oneself.  (ECF No. 13, p. 20).  She also found mild limitations in his ability to understand, remember, or apply information and interact with others.  The ALJ correctly noted that the Plaintiff did not require reminders to care for his personal needs; could follow instructions; drive; go out alone; attend regular medical appointments; and generally got along well with family, friends, and neighbors, though he rarely engaged in social activities.  Despite allegations that he could not pay attention for very long, Plaintiff also admitted that he could handle his finances.

The evidence does not indicate that his alleged agoraphobia was severe or that it resulted in impairment beyond the ALJ's restriction to simple, routine, and repetitive tasks involving few variables, little judgment, and superficial social interaction, and requiring simple, direct, and concrete supervision.  As previously mentioned, the Plaintiff sought out inconsistent treatment for his mental impairments, received only conservative treatment when he did so, and appeared to respond favorably to the medications prescribed.  LPC Hays and LPC Knapple only examined the Plaintiff on one occasion each.  His other treating physicians, although not mental health specialists, neither diagnosed nor documented objective findings consistent with a diagnosis of

agoraphobia.  As such, we do not find that additional mental restrictions were warranted.  And we conclude that the ALJ's RFC restrictions adequately accounted for the Plaintiff's anxiety disorder.

As for his alleged manipulative limitations, the record does not provide support for a finding that manipulative restrictions were necessary.  The relevant medical evidence reveals no complaints of ongoing treatment for wrist problems and no objective wrist/hand/finger abnormalities.  Thus, while the Plaintiff may well have experienced some wrist pain, it did not rise to a level that significantly interfered with the ability to use his hands/wrists/fingers to perform work-related activities.

Plaintiff also appears to take issue with the ALJ's inclusion of environmental restrictions in the RFC.  The record, however, does indicate that he suffered from COPD.  (ECF No. 13, pp. 833-837).  Although the evidence does not necessarily show that environmental restrictions were necessary, we find no error in their inclusion.  If anything, their inclusion helped the Plaintiff, as it narrowed the field of jobs available to him in the national economy.  It also provides further proof that the ALJ considered the Plaintiff's impairments in combination, as she is required to do.

Accordingly, following a thorough review of the record, the undersigned finds substantial support in the record for the ALJ's determination that the Plaintiff can perform sedentary work with environmental and mental restrictions.

## IV.   Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties**

that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 7th day of April 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE